******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# IN RE GEOFFREY G.*
## (AC 43066)

Alvord, Moll and Devlin, Js.

*Syllabus*

The respondent mother appealed from the judgment of the trial court terminating her parental rights with respect to her minor child, G. The mother claimed for the first time on appeal that the trial court violated her due process rights by failing to order, sua sponte, an evaluation of her competency to assist her counsel at trial. *Held* that the respondent mother could not establish a violation of her right to due process: although the mother claimed that certain evidence demonstrated that her mental health issues interfered with her ability to provide her counsel at trial with truthful, relevant data in the presentation of her case and, although it was undisputed that the mother had severe mental health issues, the court did not abuse its discretion in declining to order a competency evaluation; rather, the record, which included the court's two canvasses of the mother, the mother's testimony, and the mother's frequent interjections during trial, permitted the court to conclude that the mother exhibited the ability to assist her counsel with a rational understanding of the proceedings against her; the court's first canvass of the mother, undertaken to determine whether she had waived her right to confidentiality prior to the testimony of her treating psychiatrist, J, revealed that she understood her right to confidentiality, desired to waive that right, appreciated the centrality of J's testimony to her defense to the allegation that she had failed to rehabilitate, and made a rational decision to waive her right to confidentiality with J in exchange for his testimony; the court's second canvass, conducted before the mother's testimony, revealed that she discussed her decision to testify with her counsel to her satisfaction, understood that she had a right not to testify, voluntarily chose to testify and be subjected to cross-examination, and had explicitly stated that she needed to defend herself; moreover, during the mother's testimony, she indicated that she had followed specific steps she was ordered to follow, displaying an understanding that her compliance was important to her defense, she was an accurate historian of the events relevant to the petition to terminate her parental rights, and, although the mother emphasized to this court a portion of her testimony that she claimed was not rational, historically accurate, or reliable, this court did not agree that, even when evaluated in isolation, her testimony indicated incompetency because, despite the mother's digressions, her testimony showed that she rationally sought to assist her counsel by articulating her efforts to bring stability to her and G's life; furthermore, the mother's frequent interjections during trial expressed an understanding of and disagreement with the allegations in the petition to terminate her parental rights, as her interruptions demonstrated that she was attentive, understood that the court may credit against her the testimony of witnesses that she disputed, rationally sought to refute such testimony, and the court was best positioned to observe the mother's demeanor, attentiveness, canvass responses and testimony at trial.

Argued January 7—officially released February 28, 2020**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Litchfield, Juvenile Matters at Torrington, and transferred to the judicial district of New London, Juvenile Matters at Waterford, and tried to the court, *Driscoll, J.*; judgment terminating the respondents' parental rights, from which the respon-

dent mother appealed to this court. *Affirmed.*

*Albert J. Oneto IV*, assigned counsel, for the appellant (respondent mother).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

ALVORD, J. The respondent Jeana G. appeals from the judgment of the trial court terminating her parental rights with respect to the minor child, Geoffrey G.[1] On appeal, the respondent claims that the court improperly failed to order, sua sponte, an evaluation of her competency to assist her counsel at trial, in violation of her due process rights under the fourteenth amendment to the United States constitution. We affirm the judgment of the court.

The following facts and procedural history, as set forth by the court in its memorandum of decision, are relevant to this appeal. Geoffrey was born in January, 2016. In the years prior to Geoffrey's birth, the respondent had an extensive history of mental health issues for which she received inconsistent treatment. In light of the respondent's mental health issues, those treating her for those mental health issues encouraged her to maintain her psychotropic medication during pregnancy. Geoffrey was born prematurely and spent additional days in the neonatal intensive care unit for his needs, including medical issues relating to withdrawal from the effects of the respondent's medication.

After his discharge from the neonatal intensive care unit, Geoffrey was in the custody of the respondent. The respondent cared for Geoffrey with the assistance of his maternal grandparents. The respondent did not live with Geoffrey's father, with whom she had a short-term and volatile relationship. On May 23, 2016, the respondent was arrested for an altercation with the maternal grandmother. In addition, it was reported that the respondent was not properly taking her medication. On May 24, 2016, the petitioner, the Commissioner of Children and Families, invoked a ninety-six hour administrative hold on behalf of Geoffrey. On May 27, 2016, the petitioner filed a neglect petition on behalf of Geoffrey, and the court, *Kaplan, J.*, issued an ex parte order granting the petitioner temporary custody of Geoffrey. At the time, the respondent was hospitalized at Backus Hospital in Norwich. On June 3, 2016, the respondent appeared in court and contested the order of temporary custody, but she waived her statutory right to a hearing within ten days. On August 4, 2016, the respondent pleaded nolo contendere to the petitioner's neglect petition, and Geoffrey was adjudicated neglected. Geoffrey was returned to the respondent's custody. The court ordered twelve months of protective supervision by the Department of Children and Families (department) and specific steps for the respondent to follow. On June 6, 2017, the petitioner filed a motion to change venue from the judicial district of Litchfield, Juvenile Matters at Torrington to the judicial district of New London, Juvenile Matters at Waterford, which was granted.

On July 10, 2017, the respondent arrived with Geof-

frey in the emergency department of Backus Hospital. The respondent appeared disheveled, was seeking medication, and was seemingly under the influence. The respondent began screaming and had to be hospitalized. Hospital staff took Geoffrey from the respondent for his own safety. On that date, the petitioner invoked a ninety-six hour administrative hold on behalf of Geoffrey. On July 12, 2017, the petitioner obtained from the court an ex parte order of temporary custody of Geoffrey. On August 1, 2017, the respondent appeared in court and agreed to the commitment of Geoffrey to the custody of the petitioner. Geoffrey has been committed to the custody of the petitioner ever since.

On May 16, 2018, the petitioner filed a petition to terminate the respondent's parental rights as to Geoffrey. The petitioner alleged that the respondent had failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of Geoffrey, she could assume a responsible position in Geoffrey's life. A trial on the petition was held before the court, *Driscoll, J.*, on December 17, 2018, and January 7, 2019. Judge Driscoll filed a memorandum of decision on May 7, 2019, in which he granted the petition terminating the respondent's parental rights as to Geoffrey. This appeal followed.

On appeal, the respondent claims that the court improperly failed to order, sua sponte, an evaluation of her competency to assist her counsel at trial, in violation of her due process rights under the United States constitution. The respondent did not preserve this claim and, thus, seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "The respondent can prevail under *Golding* only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *In re Glerisbeth C.*, 162 Conn. App. 273, 279, 130 A.3d 917 (2015), cert. denied, 320 Conn. 921, 132 A.3d 1094 (2016).

The first prong of *Golding* is satisfied because the record is adequate to review the respondent's claim. The respondent also satisfies the second prong of *Golding* because "her claim is based upon the alleged violation of her fundamental constitutional right not to be deprived of her liberty—specifically, her basic constitutional right to raise and remain together with her [child] free from interference by the state—without due pro-

cess of law." Id., 279–80; see also *In re Alexander V.*, 223 Conn. 557, 560, 613 A.2d 780 (1992). The respondent, however, cannot establish a violation of her constitutional right to due process because we conclude that the court did not improperly fail to order, sua sponte, an evaluation of her competency to assist her counsel at trial. Therefore, her claim fails under the third prong of *Golding*.

We begin by setting forth the established principles of law and the standard of review. In *In re Alexander V.*, supra, 223 Conn. 565–66, our Supreme Court held that, "under certain circumstances, due process requires that a hearing be held to determine the legal competency of a parent in a termination case." The court stated "that due process does not require a competency hearing in all termination cases but only when (1) the parent's attorney requests such a hearing, or (2) in the absence of such a request, the conduct of the parent reasonably suggests to the court, in the exercise of its discretion, the desirability of ordering such a hearing sua sponte. In either case, the standard for the court to employ is whether the record before the court contains specific factual allegations that, if true, would constitute substantial evidence of mental impairment. . . . Evidence is substantial if it raises a reasonable doubt about the [parent's] competency . . . ." (Citations omitted; internal quotation marks omitted.) Id., 566. "[T]he trial court must be attuned to the potential of any evidence in the case before it to raise doubt as to the [parent's] competency to stand trial. Evidence, for this purpose, includes all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court." (Internal quotation marks omitted.) *In re Glerisbeth C.*, supra, 162 Conn. App. 282.

"Whether evidence of record raises a reasonable doubt as to a parent's competency to stand trial depends, in the first instance, upon its generic potential, if credited, to raise doubt about the parent's mental competency. By definition, a mentally incompetent person is one who is unable to understand the nature of the termination proceeding and unable to assist in the presentation of his or her case. . . . If, then, any evidence of record is found to have the potential to raise doubt as to a respondent parent's ability to understand the proceedings against her and to assist her counsel in the presentation of her case, the court must determine, in the exercise of its sound discretion, whether such evidence actually raises a reasonable doubt about the parent's present competency to stand trial in the context of the entire case. . . . This second, discretionary step is essential because the true focus of a competency inquiry is not the long-term mental health history of the respondent parent, but her present ability to consult with [her] lawyer with a reasonable degree

of rational understanding—and whether [she] has a rational as well as factual understanding of the proceedings against [her]." (Citations omitted; internal quotation marks omitted.) Id.

"Because the true focus of the competency inquiry is the parent's present ability to assist her counsel with a rational understanding of the proceedings against her at the time of trial, [t]he trial judge is in a particularly advantageous position to observe a [respondent's] conduct . . . and has a unique opportunity to assess a [respondent's] competency. A trial court's opinion, therefore, of the competency of a [respondent] is highly significant. . . . [W]e [thus] give deference to the trial court's [competency determination] because the trial court has the benefit of firsthand review of the [respondent's] demeanor and responses during the [proceeding]." (Citation omitted; internal quotation marks omitted.) Id., 283.

"In determining whether a trial court has abused its discretion, an appellate court must make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Accordingly, review of [discretionary] rulings is limited to questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . . This standard of review applies no less to a discretionary determination not to act sua sponte when to do so is required by law in particular circumstances than to a discretionary ruling expressly granting or denying a request by counsel that the court so act." (Citations omitted; internal quotation marks omitted.) Id.

The respondent argues that the court "denied her the due process of law by failing to conduct a competency evaluation of her in the face of specific evidence in the record that her schizoaffective disorder, at the time of trial, interfered with her ability to provide her newly retained counsel with truthful, relevant data in the presentation of her case." The respondent relies heavily on this court's analysis in *In re Glerisbeth C.* to frame her argument. The respondent states that, like the mother in *In re Glerisbeth C.*, she "suffered from long-standing mental health issues, including schizoaffective disorder, which made it difficult for her to distinguish fantasy from reality." Distinguishing herself from the mother in *In re Glerisbeth C.*, who last had a psychotic episode approximately one year before her trial; *In re Glerisbeth C.*, supra, 162 Conn. App. 286; the respondent argues that "her psychotic symptoms had not abated by the time of trial, but manifested themselves in the months and weeks leading up to the trial, climaxing with her testimony to the trial court, wherein she expressed her psychotic hallucinations to the trial judge as if her fantasies, for which she had recently been hospitalized, were truthful and real." The respondent

further identifies specific record evidence that she argues had raised a reasonable doubt as to her competency to assist her counsel at trial, including the following: the respondent's three psychiatric hospitalizations between July and November, 2018, that occurred despite treatment she received with medication and thirty-six rounds of transcranial magnetic stimulation (TMS) from March through November 16, 2018; court-appointed psychologist Nancy Randall's evaluation of the respondent, and Randall's testimony that the respondent had issues with her quality of thinking and "some paranoia and delusional thinking that takes precedence over the mood disorder"; testimony of the respondent's psychiatrist, Walide Jaziri, who, although he did not concede that she suffered from schizoaffective disorder, acknowledged that she continued to suffer from delusional and paranoid thinking and opined that she would require at least six more months of treatment with the injectable anti-psychotic drug Invega and further rounds of TMS therapy before she could become psychiatrically stabilized; and the respondent's own testimony at trial, which, the respondent argues, "devolved into an exhibition of her psychotic delusions, which she sought to present to the court as reality." We are not persuaded.

The parties do not dispute that the respondent has severe mental health issues, which can cause her to have paranoid and delusional thinking. The court found that the respondent had "severe mental health issues, which she is unable or unwilling to treat for a sustained period of time, [which] will prevent . . . any capacity for stability in [her] life." Nevertheless, we cannot conclude from our review of the trial record that the court improperly failed to order, sua sponte, an evaluation of the respondent's competency. Rather, the record reflects that the respondent exhibited a "present ability to assist her counsel with a rational understanding of the proceedings against her at the time of trial . . . ." See *In re Glerisbeth C.*, supra, 162 Conn. App. 283. Specifically, the court's canvasses of the respondent, the entirety of the respondent's testimony, and the respondent's frequent defensive interjections during trial permitted the court to conclude that the respondent had both a rational understanding of the proceedings and a present ability to assist her counsel, without the need for an evaluation of her competency.

At trial, the court canvassed the respondent twice. These two canvasses support the court's conclusion that the respondent was competent at trial and, thus, that no evaluation of her competency was necessary.

During the first canvass, the court determined whether the respondent was waiving her right to confidentiality with her psychiatrist, Jaziri, before he could testify.[2] See General Statutes §§ 52-146d and 52-146e. The respondent answered all of the court's questions

in the affirmative, indicating that she understood her statutory right to confidentiality with her psychiatrist and that she desired to waive that right. The canvass further reveals that the respondent appreciated the centrality of Jaziri's testimony to her defense to the allegation that she had failed to rehabilitate. In his testimony, Jaziri stated his diagnosis of the respondent, which differed from the one provided by Randall. Whereas Randall diagnosed the respondent with schizoaffective disorder, Jaziri diagnosed her as having "[m]ajor depression with psychotic features and [a] history of [obsessive compulsive disorder] and anxiety." Jaziri's diagnosis, which was more favorable to the respondent, when combined with his opinion that "[s]he needs more time for the medication to work," reflected an optimistic prognosis of the respondent's ability to rehabilitate. Relying on Jaziri's testimony, the respondent requested that the court grant her additional time to further rehabilitate before terminating her parental rights as to Geoffrey G. Therefore, the respondent's rational decision to waive her right to confidentiality with Jaziri in exchange for his beneficial testimony supports the court's determination that she understood the nature of the proceedings and that she was assisting her counsel at trial by facilitating the testimony of a witness favorable to her.

The second time the court canvassed the respondent was prior to her own testimony.[3] As she had done previously when canvassed regarding Jaziri's testimony, the respondent responded affirmatively to each of the court's questions, which ensured that she had the opportunity to discuss her decision to testify with her counsel and was satisfied with his advice, and that she understood that she had a right not to testify, could not be forced to testify, and was freely and voluntarily choosing to testify and to be subject to cross-examination. In a notable exchange during the canvass, the court asked the respondent if it was her "desire to be a witness," to which she responded, "[y]es, I need to defend myself." In addition, just prior to the court's canvass of the respondent, her counsel stated: "[The respondent] would like to testify, Your Honor. I've been discussing this with her since we were last in court periodically as well as for the past hour, hour-and-a-half here today. I informed her of all of the rights and responsibilities and the impact of her testifying with me as well as with the other counsel and she's prepared to go forward."

The statement by the respondent's counsel advising the court of the respondent's intention to testify, the statement of the respondent that she needed to defend herself, and the court's canvass as a whole reveal that the respondent made an informed and voluntary decision to testify on her own behalf. During the canvass, she professed to the court an understanding that she did not have to testify and that there were risks to doing

so. She further acknowledged having discussed this decision with her counsel, which her counsel confirmed, and to being satisfied with the advice provided to her. Although there was no requirement that she testify and she knew of the risks of doing so, the respondent explicitly stated her concern that she must testify in her own defense. Thus, this second canvass provides further support for the conclusion that the respondent understood both the nature of the proceedings and the allegations being made against her, and that she provided assistance to her counsel by deciding to testify on her own behalf.

The respondent's testimony, as a whole, also reinforces the court's conclusion that the respondent understood the proceedings and assisted her counsel at trial. The respondent testified that she recognized a document outlining the specific steps that she was ordered to follow. The respondent testified to having followed those steps, thereby displaying an understanding that her compliance was important to her defense against the petitioner's allegation that she failed to rehabilitate. The respondent further testified as to the progress being made toward addressing her mental health issues as a result of her treatment with Jaziri. The respondent stated that as a result of Jaziri's treatment she is "absolutely more clearheaded," and that she "think[s] more clearly," "act[s] more clearly," and "feel[s] [she is] doing very well." This testimony contradicted evidence offered by the petitioner that the respondent had failed to rehabilitate from her mental health issues, reflecting her understanding of the substance of the proceedings and exemplifying assistance provided by her to her counsel.

While testifying, the respondent was an accurate historian of the events that were relevant to the petition to terminate her parental rights. When asked about the document containing her specific steps, the respondent accurately stated that it was given to her more than one year earlier. The respondent recited in detail her past residences and the length of time she resided at each location. The respondent stated the precise amount of money she receives from Social Security benefits, Medicaid, and food stamps, which comprised her monthly income. Lastly, the respondent testified as to the parenting education, individual counseling, and medication management services she had received, including when and where she had received those services. The accuracy of the respondent's testimony supported the conclusion that she had a rational and factual understanding of the proceedings, and that she assisted her counsel at trial.

In her brief, the respondent emphasizes a portion of her testimony that "devolved into an exhibition of her psychotic delusions" to argue that the court should have ordered a competency hearing sua sponte. According

to the respondent, this testimony was "neither rational, historically accurate, nor reliable." While the parties do not dispute that the portion of her testimony that the respondent highlights arguably exhibits paranoid and delusional thinking, we do not agree that, even when evaluated in isolation, it is indicative of incompetency.

In the relevant testimony, the respondent was asked by her counsel why she moved from one of her previous residences. Her counsel asked, "[w]ith respect to Thamesview . . . what happened there between June 6 and November 16, [2018] that caused you to leave?" The respondent began her response by stating that she "wanted a stable place for [her] son." The respondent then digressed, stating, in part, that "[s]omeone was spreading rumors that my father molested me. So when I got out of the car people were screaming that I was molested by my father. . . . Fights were breaking out at Thamesview in my defense." After this aside, the respondent reiterated that "I just—that's why I'm looking for a different place to live and I'm more stable out of Thamesview right now." On cross-examination, when the respondent was asked about an incident in which she "called the police to report a suspicious incident that [she] had seen [her] ex-husband . . . in the complex," she answered incoherently. She stated, inter alia, that "tenants were coming up to [her and] telling [her] that they had the police believing [she] was hearing voices," and that "other tenants were trying to help [her] in calling [the police and] . . . telling [the police] that fights were breaking out, they're laughing hysterically at [her], they were . . . saying stop making fun of her, her father molested her."

Even though parts of this testimony arguably reveal paranoid and delusional thinking, the court did not abuse its discretion by concluding that the respondent was competent during this testimony. In response to the question from her counsel, the respondent explained that her move from her prior residence was made in an effort to bring stability to her life and Geoffrey G.'s life should they be reunified. This part of the respondent's answer was consistent with testimony of Jaziri, who stated that "in psychiatry the treatment is bio-psycho-social. . . . So you have to treat them biologically but they have to have a stable and social and psychological life which means she has to have some kind of stable home . . . ." Stability has been recognized as significant to the development of minor children in termination of parental rights cases. See *In re Jacob W.*, 330 Conn. 744, 774, 200 A.3d 1091 (2019) ("[our Supreme] [C]ourt has repeatedly recognized that stability and permanence are necessary for a young child's healthy development" [internal quotation marks omitted]). Thus, despite the respondent's digressions in her answers to counsel's questions, her testimony nonetheless shows that she understood the nature of the proceedings and that she rationally sought to assist

her counsel by articulating her efforts to bring stability to her and Geoffrey's life.

Moreover, even assuming that we agreed with the respondent that she exhibited incompetence in the isolated portion of her testimony discussed in the preceding paragraphs, we do not agree that this instance was representative of her level of competency throughout the trial. As discussed previously, the remainder of the respondent's testimony was largely coherent and historically accurate.

During trial, the respondent interjected several times in ways that also expressed an understanding of, and disagreement with, the allegations in the petition to terminate her parental rights. Furthermore, by refuting testimony of others that she believed was inaccurate, the respondent was seeking to assist her counsel. For instance, during her counsel's cross-examination of Pamela Jones, a former independent contractor for the Family Network Agency and Geoffrey's visitation supervisor, Geoffrey's developmental deficiencies were discussed. When those deficiencies were attributed to the respondent, she interrupted the questioning, stating, "[n]ot my fault." At another point, while cross-examining Meredith Bonagura, an employee of the department, the respondent's counsel asked: "[W]hat were the concerns that were reported from Backus Hospital on July 12, [2017] other than that [the respondent] had presented with a report of being sexually abused?" Bonagura responded that "[the respondent] dropped Geoffrey," prompting the respondent to state, "[n]o, I didn't." Bonagura also was asked during cross-examination by counsel for the minor child whether the respondent was arrested in 2016 for assaulting Geoffrey's maternal grandmother, to which the respondent interjected, "[i]t's nolled. It isn't true. It didn't happen." Finally, when Jaziri was asked about the respondent's living situation, Jaziri answered that the respondent was living near her parents, specifically, he believed, in Milford. The respondent corrected Jaziri, stating, "I live in Branford now." While it is inappropriate for a litigant to interject during the testimony of other witnesses, we acknowledge that it is an understandable impulse of a parent defending against a petition to terminate his or her parental rights. In this case, the respondent's interruptions show that she was attentive during trial, understood that the court may credit against her the testimony of witnesses that she disputed, and rationally sought to refute such testimony. Therefore, the court reasonably could have concluded from these interruptions that the respondent possessed a rational understanding of the proceedings and was able to assist her counsel at trial.

In addition, we reiterate that the court was best positioned to observe the respondent's demeanor, attentiveness, canvass responses, and testimony at trial. See

*In re Glerisbeth C.*, supra, 162 Conn. App. 283 ("[a] trial court's opinion . . . of the competency of a [respondent] is *highly significant*" (emphasis added; internal quotation marks omitted)). The court's advantageous position lends additional support to our conclusion that its disinclination to order, sua sponte, an evaluation of the respondent's competency was not improper.

For the foregoing reasons, we conclude that the court did not abuse its discretion by declining to order, sua sponte, an evaluation of the respondent's competency to assist her counsel at trial. Therefore, the court did not violate the respondent's due process rights under the United States constitution and, accordingly, her claim fails under the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** February 28, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] On June 12, 2018, the court also terminated by consent the parental rights of Geoffrey's father, Richard S. The father has not appealed from that judgment. Therefore, we refer only to Jeana G. as the respondent throughout this opinion.

[2] The following colloquy transpired prior to Jaziri's testimony:

"The Court: And . . . before we proceed, I understand that . . . Jaziri is not a court-appointed evaluator, that he's [the respondent's] private provider. So . . . for . . . Jaziri's benefit and the benefit of the record, I want it clear that you are waiving any claim of confidentiality. Under our state statutes . . . Jaziri is not allowed to reveal the content of your discussions in your treatment.

"[The Respondent]: He can.

"The Court: So you have no objection to his answering questions about your treatment with him?

"[The Respondent]: That is correct.

"The Court: You understand those—

"[The Respondent]: Yes, I do.

"The Court: —those questions are going to be asked by all the lawyers.

"[The Respondent]: Right. Yes, I do.

"The Court: So they may be delving into areas that you will be uncomfortable with or that you feel may not be helpful to you, and you understand that if that happens, you can't say, well, I don't want those questions answered, only my questions.

"[The Respondent]: Right."

[3] The court's second canvass of the respondent proceeded in relevant part as follows:

"The Court: Have you had enough time to talk to your lawyer?

"[The Respondent]: Yes, I have.

"The Court: Okay. . . . [A]re you satisfied with the advice and the assistance of your counsel?

"[The Respondent]: Yes, I am.

"The Court: Okay. And you understand you do not have to be a witness? . . .

"[The Respondent]: Yes, I do. . . .

"The Court: No lawyer has requested that [an adverse inference be drawn against you for not testifying]. So if you don't testify I'm not going to draw any conclusions at all based upon your not being a witness.

"[The Respondent]: Okay.

"The Court: So it's not going to be held against you in any way, you understand that?

"[The Respondent]: I understand that.

"The Court: Okay. But it's your desire to be a witness?

"[The Respondent]: Yes, I need to defend myself. . . .

"The Court: But you understand, you've been through the process now—

"[The Respondent]: Right.

"The Court: —so you know how it works. [Your counsel] will be asking questions.

"[The Respondent]: Yes.

"The Court: But then [the petitioner's counsel], and [counsel for the minor child]—

"[The Respondent]: Yes.

"The Court: —and even the court may ask you questions and some of those questions you may say ooh, this is not comfortable for me or this information is not going to help my case.

"[The Respondent]: Okay.

"The Court: And if that's the situation, one, you have to answer truthfully and two, it's too late then to say I changed my mind I don't want to be a witness.

"[The Respondent]: I understand. . . .

"The Court: Okay. And this is your voluntary act?

"[The Respondent]: It sure is.

"The Court: Nobody's forcing you to do this?

"[The Respondent]: Nobody is forcing me."

———————————————